IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

JUN 1 1 2014

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

CAROLYN CHRISTINE CHANDLER,

      Plaintiff,

v.                                                  Civil Action No. 3:14CV19
                                                    (The Honorable Gina Groh)

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the Commissioner of the Social

Security ("Defendant" and sometimes "Commissioner") denying Carolyn Christine Chandler's

("Plaintiff") claim for supplemental security income benefits ("SSI") under Title XVI of the Social

Security Act. The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact

and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for SSI on March 11, 2011, alleging disability since October 2,

2010, due to panic attacks, anxiety, deterioration of the spine, osteoarthritis, fibromyalgia, and diabetes

(R. 20, 128, 142, 146). The state agency denied Plaintiff's application initially and on reconsideration

(R. 74-75). Plaintiff requested a hearing, which Administrative Law Judge Terrence Hugar ("ALJ")

held on August 31, 2012, and at which Plaintiff, represented by counsel, and Eugene Czuczman, a

vocational expert ("VE"), testified (R. 36-74). On September 27, 2012, the ALJ entered a decision

finding Plaintiff was not disabled (R. 20-31). Plaintiff filed a request for review of the ALJ's decision

with the Appeals Council (R. 14-16).  On December 19, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II.  FACTS

Plaintiff was born on July 2, 1974, and was thirty-six (36) years old on her alleged disability date (R. 128).  Plaintiff completed the ninth grade in school and had past work as a waitress (R. 147).

Plaintiff established care with Lively Healthcare Center on August 10, 2010 (R. 231-33).  Plaintiff smoked one (1) package of cigarettes per day (R. 234).  In the new patient questionnaire, Plaintiff listed arthritis, joint pain, and dental problems as ailments and fatigue and difficulty walking as symptoms (R. 234-35).  Plaintiff reported she experienced bilateral leg pain, which was worse because she stood "alot" (sic).  Plaintiff's experienced pain daily, and it was relieved by "very warm baths."  Plaintiff reported her pain as "10-10" on a scale of one-to-ten (1-10)) at its worst; her pain was four (4) on the day of the appointment.  Plaintiff experienced numbness.  She was diagnosed with leg and hip pain and prescribed Ultram and Mobic (R. 250).

Plaintiff's August 10, 2010 right knee x-ray showed "[m]ild narrowing of the medial joint space which could represent early developing degenerative changes" (R. 253-54).

On August 24, 2010, Plaintiff reported to a medical professional at Lively Healthcare Center that she continued to experience bilateral hip and leg pain and the medication was "not helping at all."  Plaintiff's right leg pain was worse than her left.  Plaintiff medicated with Ultram and Mobic.  Plaintiff reported spasm.  She had difficulty falling and staying asleep, slept two (2) hours per day, and was fatigued.  Plaintiff was diagnosed with diabetes mellitus, type two (2), leg pain, and insomnia.  She was prescribed Elavil and Metformin (R. 249).

On September 15, 2010, Plaintiff presented to Lively Healthcare Center with complaints of bilateral leg pain. Plaintiff's reflexes were "1+" on the right. Her strength was 5/5. She medicated with Ultram and Elavil. She was diagnosed with lumbar pain with radiculopathy and prescribed Neurontin. Elavil was discontinued (R. 248).

Plaintiff presented to the emergency department at Stonewall Jackson Memorial Hospital on September 23, 2010, with bilateral leg pain. She described her left leg pain as "sharp" and "shooting." The examination of her systems was normal (R. 215). Plaintiff ambulated into the emergency department (R. 217). Upon examination, she was positive for "some spinal tenderness" of her lower extremities and pain to palpation at L5-S1 (R. 225). She was prescribed Percocet (R. 221). Plaintiff was scheduled for a MRI on September 24, 2010 (R. 229).

Plaintiff's September 24, 2010, lumbar spine MRI showed "minor disc and facet degeneration" and "no significant narrowing" at L2-L3; "mild disc and facet degeneration no significant narrowing" at L3-L4; "moderate facet degeneration and ligamentum flavum attending causes some mild effacement of the posterior ventral thecal sac" and "no definite neuroforaminal narrowing demonstrated" at L4-L5; and a "tiny central disc protrusion measuring 2-3mm is suspected" but it "causes no significant central canal or neural foraminal narrowing" (R. 251).

On September 25, 2010, Plaintiff reported to a medical professional at Lively Healthcare Center that she had experienced "no change" to bilateral leg pain while medicating with Neurontin. She was diagnosed with lumbar pain with radiculopathy and prescribed Lortab and Neurontin (R. 247).

Plaintiff reported to a medical professional at Lively Healthcare Center on September 30, 2010, that she had elevated lumbar pain. She was prescribed Neurontin. An injection to her back was offered, but Plaintiff did "not desire" to have one (R. 246).

Dr. France, of the West Virginia University Spine Center, reviewed Plaintiff's medical history and "films" on October 26, 2010. He diagnosed degenerative disc disease of the lumbar spine and recommended physical therapy (R. 268-69). Plaintiff stated her husband was unemployed and she could not afford physical therapy; however, she was "going back to work herself and will go when she can afford it" (R. 268).

Plaintiff did not present for a November 1, 2010, medical appointment at Lively Healthcare Center, but, on November 9, 2010, was examined by a medical professional for bilateral shoulder pain, lumbar pain, and spasm. She was positive for diffuse arthritic pain and prescribed Lodine, Lortab, and Flexeril. Her dosage of Neurontin was increased (R. 243).

On January 7, 2011, Plaintiff reported to a medical professional at Lively Healthcare Center that she had difficulty walking and fatigue. Flexeril did not relieve her symptoms, but Neurontin "helped." It was noted Plaintiff was positive for diffuse musculoskeletal pain. The soreness in her legs was reduced. She was diagnosed with arthralgia and prescribed Lortab and Neurontin (R. 242).

Plaintiff was evaluated for arthralgias by Dr. Narla, a rheumatologist, on March 2, 2011. Plaintiff reported she experienced musculoskeletal pain, which was located in her legs, hips, lower back, arms, shoulders, and knees. Plaintiff reported the pain had been present for one (1) year. Plaintiff reported she ached "all over." Physical therapy did not "much help." She experienced ankle and knee swelling and leg and feet numbness. Plaintiff experienced leg stiffness and intermittent hand pain (R. 262). Plaintiff reported she attempted to exercise, but her pain was worse after walking. Mobic, Elavil, and Ultram did not relieve her pain. Neurontin "seem[ed] to be helping." Plaintiff had sleep disturbances. She felt the urge to move her legs at night. She had been treated for restless leg

syndrome with Requip, but it "did not help." Plaintiff reported fatigue. She medicated with Neurontin, Lodine, Lortab, Flexeril, and Metformin (R. 263, 275-279).

Plaintiff reported she was married; she smoked one (1) package of cigarettes per day; she did not drink alcohol; and she had not worked since October 2010 due to her "disability" (R. 263). Dr. Narla reviewed Plaintiff's systems and found her head, eyes, ears, nose, throat, chest, cardiovascular system, gastrointestinal system, urinary system, hematological system, and skin were normal. Plaintiff was a diabetic. She was negative for depression, hallucinations, or delusions. Plaintiff was oriented as to time, place, and person (R. 264). Upon examination, Dr. Narla found "some tenderness" with movement of the right shoulder; her left shoulder was normal. Here elbows, wrists, and fingers were normal. There was no tenderness in her sacroiliac joints. Plaintiff's hips were normal with "good" range of motion; she was positive for trochanteric bursitis, bilaterally. Plaintiff was positive for crepitus in both knees. Her spine was "within normal limits"; however, she had lower lumbar paraspinal tenderness. Dr. Narla found Plaintiff was positive for sixteen (16) out of eighteen (18) tender points; specifically, in her bilateral anterior chest wall, lower cervical, trapezius, suprapspinatus, glulteal, greater trochanteric, lateral epicondylar, and medial fat pad areas. Plaintiff's motor strength, sensory examination, and reflexes were all normal. Dr. Narla considered Plaintiff's January 2011 laboratory report, MRI, knee x-rays, and pelvic x-ray (R. 265, 275-79).

Dr. Narla found Plaintiff "appear[ed] to have fibromyalgia based on her symptoms and history," trochanteric bursitis, sleep disturbance, and early onset osteoarthritis. Dr. Narla "suggested" Plaintiff medicate with Lodine, prescribed Cymbalta, continued Plaintiff's prescriptions for Flexeril and Neurontin, and "suggested" Plaintiff lower her dosage of Flexeril and Neurontin when she began medicating with Cymbalta (R. 265, 275-79). Dr. Narla "encouraged" Plaintiff to exercise (R. 279).

On March 7, 2011, Plaintiff reported to a medical professional at Lively Healthcare Center that she had knee pain. She was diagnosed with osteoarthritis and prescribed Lortab (R. 241).

Plaintiff completed a Function Report–Adult on April 21, 2011. She stated that it took her an hour to get out of bed in the morning because her joints were too stiff to move. Plaintiff tried to do household chores but needed to keep stopping because she did not feel like completing them. Plaintiff took care of her husband and son by cooking for them. Her sister helped her run the sweeper, dust, and do whatever else needed done around the house. Plaintiff had no issues with personal care (R. 154). She used to fix complete meals, but she and her family now ate a lot of frozen dinners and sandwiches because Plaintiff did not "feel like cooking complete meals." Plaintiff would put laundry into the washing machine (R. 155). She went outside on the porch approximately once per day. Plaintiff could drive and go out alone. Most of the time, her sister went to the grocery store for her. Plaintiff stated that she would shop once a month because it took her a couple of hours to walk around the store. She could pay bills and count change, but could not handle a savings account or use a checkbook/money orders because she was afraid of "forgetting something" (R. 156). Plaintiff did not have any hobbies other than watching some television. She did not spend time with others (R. 157). Plaintiff reported that she could only lift about five (5) pounds and that her hips and legs hurt when squatting, bending, and standing. Her legs began to hurt if she walked very far, and her shoulders hurt when reaching. Plaintiff's hands hurt "a lot" when she used them (R. 158). She did not handle stress well and did not do well being around a lot of people because she got too nervous (R. 159).[1]

_____

[1] Plaintiff completed another Function Report–Adult on July 12, 2011. In this report, Plaintiff stated that on a typical day, she would read a magazine with her legs propped up. Her son helped to take care of her (R. 171). In this report, Plaintiff was able to handle a savings account and use a checkbook/money orders (R. 173). Plaintiff's hobbies included television and reading (R. 174). She did not go around anyone and stayed in her room most of the time (R. 175).

On May 23, 2011, Dr. Franyutti, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 289). Plaintiff could never climb ladders, ropes, and scaffolds; she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (R. 290). Plaintiff had no manipulative, visual, or communicative limitations (R. 291-92). Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold and heat, vibration, and hazards; Plaintiff's exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation was unlimited (R. 292). Dr. Franyutti found Plaintiff was partially credible as Plaintiff's activities of daily living "appear[ed] to be exagerated" (sic) (R. 295).

On June 13, 2011, Morgan Morgan, M.A., completed a Mental Assessment of Plaintiff for the West Virginia Disability Determination Service. Mr. Morgan noted Plaintiff was cooperative; she had no difficulty with her posture or gait. Plaintiff stated she was seeking Social Security benefits due to hip and joint pain related to osteoarthritis, fibromyalgia, and degenerative disc disease. Plaintiff reported depressive episodes (R. 296). She experienced poor attention, concentration, and recall. She was socially withdrawn; her libido was diminished. Plaintiff reported symptoms of anhedonia. She was easily frustrated and irritable. Plaintiff reported difficulty sleeping. She had diminished appetite. Plaintiff stated she had lost weight from two-hundred-eighty (280) pounds to one-hundred-fifty-five (155) pounds. She had crying spells and low energy. Plaintiff denied symptoms of PTSD and mania and she had no suicidal ideations (R. 297).

Plaintiff listed her daily activities as follows: rose at 9:00 a.m., stayed home, cared for her personal hygiene, cooked three (3) simple meals daily and one (1) meal weekly "from scratch" (R. 298). Plaintiff washed dishes daily and did housework twice weekly. She worked for "two hours over the course of the day." She did not do any outside chores. She washed laundry weekly. Plaintiff ate at restaurants monthly and drove when she needed to drive. She rarely shopped. She watched television and read magazines and newspapers. Plaintiff spoke on the telephone with her best friend, mother, and sister. Her mother visited three (3) times weekly; her sister visited her a "couple" times weekly. Plaintiff reported she got along well with others (R. 299).

Upon examination, Mr. Morgan noted Plaintiff's eye contact was good. She was spontaneous. The length and depth of her verbal responses were within normal limits. Plaintiff was extroverted, but tense, during the examination. Mr. Morgan found her speech was relevant and coherent and at a normal pace. She was oriented as to time, name, place, and date. Plaintiff's mood was dysphoric and anxious; her affect was restricted. He found Plaintiff displayed no signs of psychosis. Her insight was mildly deficient; her judgment was normal; her immediate recall was normal; her recent recall was severely deficient; her remote recall was normal; and her concentration was mildly deficient. Mr. Morgan diagnosed major depressive disorder, recurrent and moderate, and pain disorder (R. 298). He found Plaintiff's persistence was severely deficient; her pace was moderately deficient; and her social functioning was moderately deficient. Mr. Morgan found Plaintiff would be able to manage funds (R. 299). Her prognosis was poor (R. 298).

On June 20, 2011, G. David Allen, Ph.D., completed a Psychiatric Review Technique of Plaintiff (R. 301). He found Plaintiff was positive for major depressive disorder, an affective disorder, a pain disorder, and a somatoform disorder (R. 304, 307). Dr. Allen found Plaintiff had no restrictions

to her activities of daily living and mild limitations to her ability to maintain social functioning, concentration, persistence, and pace. Dr. Allen found Plaintiff had had no episodes of decompensation (R. 311). Dr. Allen relied on the report of Psychologist Morgan in making his determinations (R. 313).

Dr. Williams completed a Physician's Summary of Plaintiff on July 22, 2011. He wrote he had last examined Plaintiff on June 23, 2011. Plaintiff's diagnosis was for diabetes, chronic leg pain, osteoarthritis, and fibromyalgia. Her prognosis was "stable." Dr. Williams expected Plaintiff's conditions to last a "lifetime." He wrote Plaintiff had "severe pain in her legs" that prevented "her from sitting/standing in any position for an extended period of time" (R. 380).

On August 23, 2011, James W. Bartee, Ph.D., reviewed the medical file and found Plaintiff had no new mental impairments, no worsening of symptoms, or signs of mental disorders. Dr. Bartee reviewed Dr. Allen's June 20, 2011 Psychiatric Review Technique and affirmed same (R. 318).

On August 25, 2011, Dr. Lateef reviewed the May 23, 2011 Physical Residual Functional Capacity Assessment completed by Dr. Franyutti and affirmed same (R. 341).

Dr. Williams treated Plaintiff on February 8, 2012, for chronic pain and diabetes. Plaintiff reported she had "been doing poorly." She had "problems" with her hands, feet, ankles, and knees. Plaintiff reported if she walked one day, then she could only walk with assistance the next day. Plaintiff reported hand swelling. She had low energy. Plaintiff reported her "sugars have been 'good.'" Plaintiff stated she had not complied with taking her medications as prescribed; she did not take them if she did "not have normal meals." Plaintiff did take between three (3) and five (5) Lortab pills each day. Plaintiff reported she smoked one (1) package of cigarettes per day and was not "ready to quit" (R. 364). Upon examination, Dr. Williams found Plaintiff was alert and in no acute distress. Her examination was normal. She was diagnosed with diabetes, chronic pain syndrome, generalized

osteoarthrosis, and vitamin D deficiency. Dr. Williams prescribed Glipizide, Metformin, Hydrocodone, Neurontin, Flexeril, and Etodolac (R. 365).

Plaintiff presented to Dr. Williams on May 31, 2012, for "follow-up" for diabetes, chronic pain syndrome, and osteoarthritis. Plaintiff denied back pain, neck pain, numbness, headaches, tingling, weakness, anxiety, depression, mood swings, and sexual dysfunction. Plaintiff smoked one (1) package of cigarettes per day; she was not "ready to quit" (R. 369). Upon examination, Dr. Williams noted Plaintiff was alert and in acute distress. Her examination was normal. Plaintiff's white blood cell and hemoglobin levels were elevated. He prescribed Flexeril, Etodolac, Neurontin, Glipizide, Metformin, and Lisinopril; he increased Plaintiff's dosage of Lortab. Prescriptions for Lancets, test strips, and a glucose meter were also provided (R. 370-71).

Dr. Williams completed a Physician's Summary on June 13, 2012. He wrote he had last examined Plaintiff on "July 12, 2012," (sic) and had diagnosed her with osteoarthritis, fibromyalgia, depression, and diabetes. Her prognosis was poor. He wrote Plaintiff had "chronic pain and depression," was unable to sit for long periods of time, and could not lift more than ten (10) pounds (R. 378).

Rod McCullough, a psychologist, "met" with Plaintiff at Plaintiff's lawyer's request on August 15, 2012. He reviewed Psychologist Morgan's June 13, 2011, assessment; a "progress note" from Dr. Narla; and the June 20, 2011, Psychiatric Review Technique of Dr. Allen. He administered the Millon Clinical Multiaxial Inventory-Third Edition to Plaintiff (R. 382). Mr. McCullough found, based on the results of the Inventory, that Plaintiff tended to be "anxious over expectations of being rejected." He agreed with Mr. Morgan's diagnosis of major depressive disorder; however, he opined "it [was] of a single episode nature as there [was] no evidence that the symptoms have ever remised for a

significant period of time." Mr. McCullough found Plaintiff's symptoms had been present for two (2) years and, thus, chronic. He found Plaintiff demonstrated melancholic features and displayed depressed mood, marked psychomotor retardation, and feelings of guilt. He opined Plaintiff's "depressive symptomatology" would "continue for a significant period of time." Mr. McCullough also agreed with Mr. Morgan's diagnosis of pain disorder. He found Plaintiff met Social Security Listing 12.04 (R. 385). He further found, "[i]n regard to 12.04A, there is evidence of anhedonia, sleep disturbance, decreased energy, psychomotor retardation, feelings of guilt, and difficulty in concentration." As to the B Criteria, Mr. McCullough found Plaintiff had marked difficulties maintaining social functioning and deficiencies in concentration and pace. "Deterioration in the work setting" was likely because of Plaintiff's mental health status (R. 386).

Dr. Williams wrote a letter to Plaintiff's counsel on September 20, 2010. In said letter, Dr. Williams wrote Plaintiff had been diagnosed with diabetes, "some degree of mild osteoarthritis and degenerative joint disease of the spine," fibromyalgia, and depression. Plaintiff experienced muscle pain and depression; her diabetes was under "fairly good control" (R. 387). Dr. Williams reviewed the Social Security criteria Plaintiff's counsel provided to him and Dr. Narla's medical record and opined Plaintiff had had intermittent health insurance; Plaintiff's testing had been "essentially normal and did not account for her severe symptoms of chronic fatigue and constant aching pain," which led to the diagnosis of fibromyalgia; and due to Plaintiff's testing positive for sixteen (16) out of eighteen (18) trigger points, her fibromyalgia "appear[ed] to approach an extreme form of the condition." Additionally, Dr. Williams wrote, relative to Plaintiff's depression, that she had experienced side effects to some of her depression medications. Dr. Williams found Plaintiff would have "noticeable

difficulty using her hands much more than occasionally," and, due to her need for frequent breaks, she would have "difficulty maintaining a work-like schedule" (R. 388).

<u>Administrative Hearing</u>

Upon questioning by her attorney, Plaintiff testified she had not worked "a lot" during the past ten (10) years due to lack of energy (R. 51). She experienced chronic back pain, joint pain, hand swelling, hand pain, and fatigue (R. 52). Plaintiff testified she had been examined by Dr. Narla one time, that Dr. Narla had left the country, and that she had not received any specialized treatment for fibromyalgia since her appointment with Dr. Narla (R. 53-54).

Plaintiff testified she was stiff when she rose in the morning. Some days, the pain was not as "harsh" as other days. Plaintiff took all medications as prescribed (R. 55). Plaintiff tried to do "normal housework" (R. 55). Sweeping caused pain. Plaintiff's son helped with chores. Plaintiff could drive to a convenience store, located two (2) miles from her home, and to doctors' appointments. Plaintiff could not cook due to fatigue (R. 56). Plaintiff testified she preferred to be alone; she did not socialize. Plaintiff had three (3) crying spells per week. Plaintiff was in bed "most of the day" (R. 58). Plaintiff testified she could not work due to lack of energy, pain, and poor concentration (R. 60-62). Plaintiff stated she watched little television and read newspapers and magazines "every once in a while" (R. 62).

The ALJ asked the VE the following:

> . . . [] [A]ssume that the individual is limited to performing light work, except the work requires a sit/stand option, allowing the person to change positions for 1 to 2 minutes every 30 minutes without going off task, with occasional past roles, except no crawling, or climbing of ladders, ropes, or scaffolds. Also, no exposure to extreme heat, cold, wetness, humidity, vibrations, and hazards such as unprotected heights and moving mechanical parts. . . . I'd like you to add – consider a second hypothetical, and for the second hypothetical, to add an additional limitation. Now, that limitation is that the individual must be limited to simple, routine, and repetitive

tasks, not able to perform goal-oriented work, must entail no more than occasional interaction supervisors, coworkers, and the public. . . . I'd like you to consider all the same restrictions that I just listed, but additionally, . . . for the third hypothetical, it would be an exertional level of sedentary . . . . (R. 67, 69).

The VE responded there would be work in the regional and national economy of a final assembler/bench assembly and a type copy examiner (R. 69).

### III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920, ALJ Hugar made the following findings:

1.  The claimant has not engaged in substantial gainful activity since March 11, 2011, the application date (20 CFR 416.971 *et seq.*) (R. 22).

2.  The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; fibromyalgia; trochanteric bursitis; early onset osteoarthritis; sleep disturbance with history of restless leg syndrome; and major depressive disorder (20 CFR 416.920(c)) (R. 22).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926) (R. 22).

[]  After careful consideration of the entire record, the undersigned finds that the claimant has a residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) with the following limitations: requires a sit/stand option allowing the person to change position for one or two minutes every thirty minutes without going off task; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl but can never climb ladders, ropes or scaffolds; must avoid all exposure to extreme cold, heat, wetness, humidity, vibrations and workplace hazards such as unprotected heights, moving mechanical parts; work is limited to simple, routine, and repetitive tasks, requiring only simple decisions, free of fast-paced production requirements, but can perform goal oriented work; and must entail no more than occasional interaction with the public, coworkers and supervisors (R. 24-25).

4.  The claimant is unable to perform any past relevant work (20 CFR 416.965) (R. 30).

5.  The claimant was born on July 2, 1974 and was 36 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963) (R. 30).

6.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964) (R. 30).

7.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 30).

8.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 406.969(a)) (R. 30).

9.  The claimant has not been under a disability, as defined in the Social Security Act, since March 11, 2011, the date the application was filed (20 CFR 416.920(g)) (R. 31).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must

also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. Because the ALJ discounted all of the psychological despite Federal Regulations requiring the opinions of Mr. McCullough and Mr. Morgan to be given most weight, then this Court must remand this case for the sole purpose of calculating benefits as the ALJ could not provide substantial evidence to support his position.

2. Because the ALJ used the RFC (instead of the entire case record) as the point of comparison for Ms. Chandler's credibility and as the point of comparison for the validity of Dr. Williams' opinion then this Court must remand for the calculation of benefits as Ms. Chandler was entirely credible and Dr. Williams' opinion was not inconsistent with other substantial evidence.

(Plaintiff's Brief at 4-15.)

The Commissioner contends:

1. The ALJ appropriately considered the medical evidence.

2. The ALJ followed the controlling regulations in assessing the credibility of Plaintiff's complaints.

(Defendant's Brief at 7-12.)

## C. Opinion Evidence

Plaintiff raises several contentions regarding the ALJ's weighing of the opinion evidence contained in the record. Plaintiff first argues that "the ALJ found her to have moderate persistence problems even though the reports of consultative psychologists Morgan Morgan and Rod McCullough both show severe problems with persistence among other Paragraph B criteria." (Plaintiff's Brief at 4-5.) She asserts that the ALJ did not cite any substantial evidence to support his findings and that

the State agency reviewing sources' opinions "cannot outweigh Mr. Morgan and Mr. McCullough." (Id. at 5-10.) Defendant argues that the ALJ was not required to give enhanced weight to Mr. Morgan's and Mr. McCullough's opinions. (Defendant's Brief at 8-10.) Plaintiff also alleges that the ALJ erred in discounting Dr. Williams' opinion because it is consistent with his treatment notes and Dr. Narla's treatment notes indicating Plaintiff's problems with her hands. (Plaintiff's Brief at 13-14.) She also asserts that the ALJ failed to cite any evidence contradicting Dr. Williams' opinion, that the ALJ "mischaracterized [her] statements showing limitations arising out of hand problems," and that the ALJ improperly compared Dr. Williams' opinion to the RFC. (Id. at 14-15.) Defendant states that the ALJ correctly discounted Dr. Williams' opinion because it was unsupported. (Defendant's Brief at 7-8.) Upon review of the ALJ's decision, the undersigned has also included the State agency physicians, Drs. Franyutti and Lateef, and State agency psychologists, Drs. Allen and Bartee, in his discussion.

20 C.F.R. § 404.1527(c) states:

*How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

   (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

   (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (I) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship*. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.*  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.*  When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996).  The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983).  In Craig, however, the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and  laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d at 590. Furthermore, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983).

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Indeed, "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977). The Administration has discussed the explanation of the weight to be given to a treating source's medical opinion, as follows:

> Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:
>
> When the determination or decision:
>
> *is not fully favorable, e.g., is a denial; or
>
> *is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;
>
> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). "[W]hen a physician offers specific restrictions or limitations . . . the ALJ must provide reasons for accepting or rejecting such opinions." Trimmer v. Astrue, No. 3:10CV639, 2011 WL 4589998, at *4 (E.D. Va. Sept. 27, 2011), aff'd by 2011 WL 4574365 (E.D. VA. Sept. 30, 2011). A logical nexus must exist between the weight accorded to opinion evidence and the record, and the reasons for assigning such weight must be "sufficiently articulated to permit meaningful judicial review." DeLoatch, 715 F.2d at 150.

      With regards to Dr. Williams' opinion, the ALJ stated:

> As for the opinion evidence, Dr. Williams, the claimant [sic] primary care physician completed two state welfare agency medical reports. On or about July 22, 2011, Dr. Williams reported that he had last seen the claimant on June 23, 2011. He reported that the claimant's diagnosis was diabetes type II, chronic leg pain, osteoarthritis and fibromyalgia. He reported that the claimant's prognosis was stable and the claimant's leg pain would prevent her from sitting or standing position for an extended period of time. Dr. Williams further stated that the claimant's condition did not require someone to stay in her home on a continuous basis and she was able to care for children under age six. On or about June 13, 2012, Dr. Williams completed a second state welfare agency form and added depression to the diagnosis. He now reported that the claimant had poor prognosis for improvement. He reported that the claimant could not sit for a long period of time and could lift no more than 10 pounds. Dr. Williams continued to report that the claimant did not require someone to stay in her home on a continuous basis. Dr. Williams again reported that the claimant was able to care for children under six but only for short periods. (Exhibit 15F). On September 20, 2012, Dr. Williams further reported the claimant to have several notable medical conditions including diabetes, mild osteoarthritis/degenerative joint disease, fibromyalgia and depression. This doctor also opined that the claimant experienced severe limitation arising out of what may best be described as a type of chronic pain disorder. This doctor also indicated that as to the claimant's fibromyalgia the claimant was referred for an original rheumatology consultation because all of her testing was essentially normal and did not account for her severe symptoms of chronic fatigue and constant aching pain. Finally, this doctor indicated that the claimant had more than occasion [sic] difficulty using her hand and opined that it would be difficult for her to maintain a work-like schedule. (Exhibit 17F). Under the circumstances, the undersigned does not find these opinions and conclusions to substantiate the presence of a totally disabling condition for a continuous period of 12 months. Ultimately, the Administrative Law Judge has accorded these opinions significant weight to the extent that they are consistent with the above Residual Functional Capacity.

Ultimately, Dr. Williams' conclusions as to the claimant's lifting capabilities are adequately accommodated for in the above Residual Functional Capacity. Furthermore, this practitioner's conclusions that the claimant could not sit for a long period of time is also sufficiently addressed with the above found limitation with regard to a "sit/stand" option articulated in the above Residual Functional Capacity.

However, the undersigned has accorded little weight to Dr. Williams' conclusions as to the purported conclusions by Dr. Williams' with regard to the claimant's use of her hands and his conclusion that it would be difficult for the claimant to maintain a work-like schedule. Under the circumstances, these conclusions are accorded little weight for a number of reasons. First, the full longitudinal record fails to support the limitation as to claimant's use of her hand. Second, the claimant's reported daily activities (Exhibits 3E and 7E), reported symptoms and noted limitations during the relevant period of time fail to substantiate the presence of a totally disabling condition. Thus, overall, the Administrative Law Judge is convinced that these reports necessitate the limitations articulated in the above Residual Functional Capacity.

(R. at 26-27.)

The ALJ did state that Dr. Williams' opinion was not consistent with the record. See 20 C.F.R. § 416.927(c)(4). However, the ALJ referred to Dr. Williams' opinion in a summary fashion without referencing a single opinion or piece of evidence with which it was inconsistent. The undersigned notes that Dr. Williams' opinion regarding Plaintiff's use of her hands may be entitled to less than controlling weight. On March 2, 2011, Plaintiff saw Dr. Narla, a rheumatologist, after being referred by Dr. Williams. Plaintiff reported that she had "noticed some pain intermittently in her hands." (R. at 262.) She also complained that she "ache[d] all over." (Id.) Subsequently, on February 8, 2012, Plaintiff saw Dr. Williams for a follow-up for her chronic pain and diabetes. She complained that "her hands feel swollen all the time." (R. at 364.) Dr. Williams diagnosed chronic pain syndrome and referred to Dr. Kafka, a rheumatologist, because of "arthralgia, possible inflammatory arthritis." (Id. at 365.) Plaintiff saw Dr. Williams again on May 31, 2012. At that time, she complained that she "had no improvement in her hands and knees" and that "the swelling

[was] more frequent." (R. at 369.) Plaintiff also reported that she had needed to take extra Lortab for pain control. (Id.) Drs. Narla and Williams did not discuss whether Plaintiff's condition precluded use of her hands; nevertheless, the ALJ failed to assess this or any other evidence in discrediting Dr. Williams' opinion. See DeLoatch, 715 F.3d at 150. Furthermore, at no point did he address any of the other factors set forth above when considering his opinion.

As noted above, the ALJ also discredited Dr. Williams' opinion regarding Plaintiff's use of her hands because her "reported daily activities . . ., reported symptoms and noted limitations throughout the relevant period of time fail to substantiate the presence of a totally disabling condition." The undersigned finds that this statement is also insufficient to assign little weight to Dr. Williams' opinion. At no point did Dr. Williams opine that Plaintiff was completely precluded from using her hands for work; rather, he was "of the opinion that [she] would have noticeable difficulty using her hands much more than occasionally." (R. at 388.) Furthermore, formulation of a claimant's RFC is not based upon "totally disabling" conditions; instead, it is the "most [a claimant] can still do despite . . . limitations." 20 C.F.R. § 416.945(a)(1).

As to Mr. Morgan and Mr. McCullough's opinions, the ALJ stated:

> Some weight is given to, the non-treating consultative psychological evaluator, Mr. Morgan's diagnosis of major depressive disorder, which is supported. However, the level of impairment attributed by Mr. Morgan is too high based on the level of activity described in Mr. Morgan's own notes and elsewhere in the file.
>
> Mr. McCullough, a non-treating psychologist obtained by the claimant's representative to provide a psychological evaluation, opined that the claimant met the criteria of Listing 12.04A and B. This opinion was based on the claimant [sic] completed mental self-assessment. Mr. McCullough stated that he agreed with the diagnoses provided by Mr. Morgan, but he felt that the claimant was more impaired than Mr. Morgan stated. (Exhibit 16F)
>
> This opinion is given little weight. The medical evidence of record does not show a longitudinal history of mental impairment and no history of treatment. In addition,

his conclusion is based on the claimant completing a subjective self-assessment. It was noted above that the claimant is not fully credible. It is noted by the undersigned that Mr. Morgan, the consultative psychological evaluated separated the claimant's subjective reports of symptoms and limitations from the objective findings during his in-depth evaluation of the claimant. This resulted in his diagnosis that is objective. Mr. Morgan's diagnosis is further supported by the claimant's lack of a previous mental health diagnosis or treatment.

(R. at 27.)

Again, the undersigned finds that the ALJ referred to these opinions in a summary fashion without referencing a specific pieces of evidence with which they were inconsistent. Although the ALJ discounts the "level of impairment attributed by Mr. Morgan . . . based on the level of activity described in Mr. Morgan's own notes and elsewhere in the file," he does not further elaborate on the specific activities to which he is referring. Again, at no point did the ALJ address any of the other factors set forth above when considering Mr. Morgan's opinion.

As to Mr. McCullough's opinion, the ALJ assigned it "little weight" because the "medical evidence of record does not show a longitudinal history of mental impairment and no history of treatment." (R. at 27.) However, the ALJ's statement regarding a lack of a "longitudinal history of mental impairment" is contradicted by the ALJ's finding that Plaintiff's severe impairments include major depressive disorder. (R. at 22.) The ALJ further discredited Mr. McCullough's opinion, stating that it was "based on the claimant completing a subjective self-assessment. It was noted above that the claimant is not fully credible." (R. at 27.) The undersigned finds that this statement indicates that the ALJ determined that Plaintiff was not fully credible before considering the entire record. He then used his opinion regarding Plaintiff's credibility to discount Mr. McCullough's opinion. Again, at no point did the ALJ address any of the other factors set forth above when considering his opinion.

Even where a treating physician's opinions are not entitled to controlling weight, they are generally entitled to more weight than the opinion of a consultative physician. See 20 C.F.R. § 416.927(d)(1). With respect to the opinions of State agency physicians Drs. Franyutti and Lateef, the ALJ stated:

> State agency medical consultants opined that the claimant retained the physical capacity for a range of light exertional work. (Exhibits 5F and 12F)
>
> These opinions have been considered and given some weight. The objective medical evidence does show that the claimant had objective evidence of degenerative disc disease of the lumbar spine. In additional [sic], 16 of 18 fibromyalgia tender points were identified by Dr. Narla. The combination of impairments support a reduction to a range sedentary exertional work.

(R. at 27.) This explanation fails to explain how Plaintiff's combination of impairments supports a reduction to sedentary work. As defined by 20 C.F.R. § 416.967(a), sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." The ALJ fails to discuss substantial evidence that supports his finding that Plaintiff has the capacity to perform sedentary work and contradicts the State agency opinions that she could perform light work. Accordingly, the undersigned finds that the reason provided by the ALJ for assigning "some weight" to the opinions given by the State agency physicians is insufficient.

With respect to the opinions of State agency psychologists Drs. Allen and Bartee, the ALJ stated:

> Some weight is given to the state agency mental health consultant G. David Allen PhD, who provided a diagnosis of major depressive disorder and pain disorder that he found non-severe. (Exhibit 7F) The claimant was given the benefit of any doubt and these impairments were found severe with appropriate mental limitations incorporated into the residual functional capacity. The same holds true for James Bartee, Ph. D., who affirmed Dr. Allen's findings. (Exhibit 9F)

(R. at 27.) Given this, the undersigned finds that the sole reason given by the ALJ for assigning "some weight" to the opinions given by the State agency psychologists is insufficient, as he provided no further explanation for what he meant by "appropriate mental limitations."

While it is the exclusive province of the ALJ to weigh the evidence contained in the record, the ALJ's findings cannot withstand judicial review when the ALJ fails to articulate its reasoning or substantiate its findings. See DeLoatch, 715 F.2d at 150; Miller v. Astrue, No. 1:12-cv-37, 2013 WL 588722, at *48-49 (N.D. W. Va. Jan. 16, 2013), aff'd by 2013 WL 557277 (N.D. W. Va. Feb. 13, 2013) (remanding case because "the ALJ's discussion of the treating physician's opinions [did] not comply with the regulations or rulings regarding treating physician opinions"); Trimmer, 2011 WL 4589998, at *6 (remanding case because ALJ failed to sufficiently articulate findings and provide substantial evidence for rejecting the opinion of a treating physician). In sum, the undersigned finds that the ALJ failed to sufficiently articulate the weight and the reasons for such weight assigned to the opinions of Mr. Morgan, Mr. McCullough, State agency physicians Drs. Franyutti and Lateef, and State agency psychologists Drs. Allen and Bartee. Accordingly, the ALJ's assessment of Plaintiff's RFC is not supported by substantial evidence.

### D.   Plaintiff's Credibility

Plaintiff also contends that "the ALJ committed factual and procedural errors in evaluating her credibility." (Plaintiff's Brief at 10.) The undersigned has already found that the ALJ failed to sufficiently articulate the weight and the reasons for such weight assigned to the opinions of Mr. Morgan, Mr. McCullough, Dr. Franyutti, Dr. Lateef, Dr. Allen, and Dr. Bartee. Having found that, the undersigned does not address Plaintiff's contention regarding the ALJ's credibility determination.

.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment be **DENIED**, and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Gina Groh, United States District Judge. Failure to timely file objections to the Report and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _11_ day of _Dec._, 2014.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE